Freedman, J. (dissenting).
By the bond in question the obligors named therein, among other things not necessary to be mentioned, bound themselves, jointly and severally, in the sum of three hundred dol *46 lars, that William B. Barnes should “faithfully account for all moneys and property belonging to-said Atlantic and Pacific Telegraph Company, which shall come to his hands, whether the same shall be-paid or delivered to him by said Atlantic and Pacific Telegraph Company, to be disbursed or used for its account, or shall be received by him from other persons for the use and benefit of said Atlantic and Pacific Telegraph Company, or shall come to his hands in any other manner.”
It is admitted that William E. Barnes, at the time of his discharge, viz., March 24, 1874, was indebted to the plaintiff on account of moneys which had come to his hands during his employment, in the sum of two hundred and sixty-nine dollars and sixty-seven cents.
The defendants insist, however, that they are not liable beyond the sum of fifteen dollars and ninety-two cents, because on January 30, 1874, William E. Barnes was in default to the plaintiff in the sum of fifteen dollars and ninety-two cents, of which plaintiff' had knowledge,- but of which fact plaintiff gave no-notice to the defendants, and because the employment of William E. Barnes was continued with such knowledge until his default amounted to two hundred and sixty-nine dollars and sixty-seven cents.
In my judgment the defendants’ claim is well-founded.
It is undoubtedly true, as plaintiff claims, that the-undertaking of the defendants, is absolute by the-express terms of the instrument. In such case the-rule in this State has always been that when one guarantees the act of another, his liability is equal to that of his principal, and that he is not entitled to notice of the principal’s default as a condition precedent to the bringing of an action against -him, unless the contract expressly provides for such notice. If the guarantor-intends to .insist on such notice, he must expressly *47 make it a condition of his contract (Union Bank of Louisiana v. Coster, 1 Sandf. 562, affirmed, in 3 N. Y. 203: Allen v. Rightmere, 20 Johns. 366; Douglass v. Howland, 24 Wend. 36; Smith v. Dann, 6 Hill, 544; Sterns v. Marks, 35 Barb. 565; Heebner v. Townsend, 8 Abb. 238; East River Bank v. Rogers, 7 Bosw. 493; Brown v. Curtiss, 2 N. Y. 225).
So it may also be conceded that, even where a different rule prevails, as for instance in the courts of the United States, all that the law requires is that the guarantor shall have reasonable notice of the failure of the principal debtor and of the intention of the guarantee to enforce the guaranty. What that notice should be, or when it should be given, is not settled, as it is by the law merchant in the case of an indorser of negotiable paper, and consequently the- question of reasonable time is left to be varied according to the facts of each particular case. The rule to be deduced from the authorities upon this point, is that the guarantor, though entitled to notice, can not defend himself by the want of it, unless the notice and demand have been so long delayed as to raise a presumption of waiver or of payment, or unless he can show that he has lost by the delay opportunities for obtaining securities, which a notice, or an earlier notice, would have given him. Under the operation of this rule a very brief delay has sometimes been held fatal to the claim of the guarantee, if it appeared that the notice could easily have been given, and that, if given, it would have saved the guarantor from loss. But in every such case the proof showed that actual negligence had caused actual injury.
And finally it may be conceded that a surety does not ¿possess the -right, to debar the principal debtor from all favor or indulgence. It was once uncertain whether a forbearance of the debt did not discharge the surety. But it is now well settled that a mere for *48 bearance leaving to the creditor the power of putting his claim in suit at any time, does not have this effect. In no case is a surety discharged by mere laches of the creditor, unless after a request to prosecute the principal (Looney v. Hughes, 26 N. Y. 514; Remsen v. Beekman, 25 Id. 552; Schroeppell v. Shaw, 3 Id. 446; Albany Dutch Church v. Vedder, 14 Wend. 165). And such request imposes no absolute duty upon the creditor to proceed at once, if delay is consistent with good faith (Black River Bank v. Page, 44 N. Y. 453).
But these several propositions which have been advanced by the plaintiff, though true as abstract propositions of law, do not touch the real question presented by the exceptions in this case.
A guaranty of the fidelity of a servant is to be presumed as founded on the trustworthiness of the servant so far as that was known to the contracting parties at the time of the contract. Any concealment, inconsistent with good faith, practiced by the employer upon the surety at the time of the making of the contract, has the effect of releasing the latter; and one of the reasons usually given for so holding, is that it is only reasonable to suppose that the fact so concealed, if known to the surety, must necessarily have influenced' his judgment as to whether he would have entered into the contract or not. If this doctrine is sound, and it is not only sound, but is established law, it seems equally reasonable to suppose that it never could have entered into the contemplation of the parties that, after the servant’s dishonesty in the service had been discovered, the guaranty, though on its face a continuing one, should continue to apply to the servant’s future conduct, when the master chose for his own purpose to continue the servant in his employ, without the knowledge or assent of the surety. If the obligation of the surety is continuing, the obligation of the creditor should be equally so, and the *49 representation and understanding on which the contract was originally founded, should continue to apply to it during its continuance and until its termination.
This will still more strongly appear, when, in connection with the proposition last discussed, it is considered that in certain cases and under certain circumstances the right of revocation exists. In Parsons on Contracts, vol. 2, p. 31, the rule is stated as follows: “If the guaranty be to indemnify for misconduct of an officer or servant, this promise is revocable, provided the circumstances are such that when it is revoked, the promisee may dismiss the servant without injury to himself on his failure to provide new and adequate sureties.” It was for this reason, that in Burgess v. Eve. (Law Rep., 13 Eq. 150), Malins, V. C., says : *1 But if there is misconduct on the part of the person whose fidelity is guaranteed: for instance, if a man guarantees that a collecting clerk shall duly account for all moneys received by him, and that a collecting clerk is found to have embezzled his employer’s money, reason requires that the man who entered into the guaranty, because he believed the person to be of good character, when he finds that he is not so, and not to be trusted, should have the power of saying: £ I now withdraw the guaranty I gave you ; I give you full notice not to trust him any more.’ Notwithstanding all that has been said, I am clearly of opinion, that a person who has entered into such a guaranty, and who is therefore responsible' for the person whose fidelity is guaranteed, has a right to withdraw from that guaranty, when that person has. been proved guilty of dishonesty.” He afterwards proceeds: “My •opinion is—and I have no hesitation in expressing it —that a person who gives a guaranty, would have a right to say to the person taking it, You will continue at your own peril to employ the person on whose *50 behalf I gave the guaranty, provided that the clerk or other person has been guilty of embezzlement or gross misconduct, or has turned out to be unworthy of the confidence reposed in him by the person giving the guarantee for him.’ If the employer, under such circumstances, refused to give the guarantee up, the person giving it would have a right to file a bill in this, court, and in my opinion would succeed in the contest, because the court would direct the bond to be delivered up to be canceled. And I think that is only what good sense, propriety, and fair dealing between man and man would dictate.”
This opinion, though not necessary for the decision of the case before the Vice-Chancellor, was adopted (as founded on equity and good sense) by the court of queen’s bench in Phillips v. Foxall (3 Eng. R. 272; S. C. 7 Law R. Q. B. 666), which was a case almost identical in its legal aspects with the case at bar.
In that case it- was distinctly held, after an examination of many authorities, that “ in case of a continuing guaranty for the honesty of a servant, if the master discovers that the servant has been guilty of acts of dishonesty in the course of the service to which the guaranty relates, and if, instead of dismissing the servant, as he may do at once and without notice, he chooses to continue in his employ a dishonest servant, without the knowledge and consent of the surety, express or implied, he can not afterwards have recourse to the surety to make good any loss which may arise from the dishonesty of the servant during the subsequent service.” As to the alleged right of revocation the court of queen’s bench came to the following conclusion: ■“ The discharge of the surety in the present case seems to us to arise rather out of the nature and equity of the contract between the parties than upon any assumed right of revocation. We think the surety is discharged unless he assents or agrees, after he has- *51 had knowledge of the dishonesty, that the guaranty shall hold good for the subsequent service; but, as a revocation of the guaranty as soon as the dishonesty has come to his knowledge, will be the best evidence of dissent, whether his discharge from the contract is founded on express revocation or want of assent after notice of the dishonesty, seems rather a question of words than of substance.”
The present case is within the limitation of the rule laid- down by Parsons as above stated, and in all respects covered by the decision in Phillips v. Foxall. When on January 30,1874, the plaintiff became fully aware that William E. Barnes was in default to the extent of fifteen dollars and ninety-two cents, good faith and the true intent and meaning of the contract of guaranty required either that William E. Barnes should be dismissed, or that notice of the defalcation be given to the defendants. True, they were bound to the extent of that defalcation without any notice whatever. But it is equally true, that after a breach of the contract of guaranty had once taken place and a liability had once attached under it, which the defendants then and there had the right to terminate and discharge by payment, the plaintiff could not, by a suppression of the fact of an existing defalcation, keep the guaranty alive and continuing so as to cover possible future contingencies not contemplated by the original contract. “It is the clearest and most evident equity” (says Lord Loughborough, in Rees v. Berrington, 2 Ves. 540) “not to carry on any transaction without the knowledge of him (the surety) who must necessarily have a concern in every transaction with the principal debtor. You can not keep him bound and transact his affairs (for they are as much his as your own), without consulting him. You must let him judge whether he will give that indulgence contrary to the nature of his engagement.”
*52 The case of Pittsburgh, Fort Wayne & Chicago R. R. Co. v. Schaeffer (8 Am. Law Reg. N. S. 110), differs in many essential particulars from the case at bar. It was, as stated by the court, a case of simple indulgence and forbearance, and that under circumstances which were not such as to call for any extraordinary diligence. The corporation itself had no knowledge of previous defalcations and it was for this reason that Sharswood, J., held, “ The fact that there were other unfaithful officers and agents of the corporation who knew and connived at his (the principal debtor’s) infidelity, ought not in reason, and does not in law or equity relieve them (the sureties) from the responsibility for him. They undertake that he shall be honest, though all around him are rogues. Were the rule different, by conspiracy between the officers of a bank, or other moneyed institution, all their sureties might be discharged.”
The People v. Berner (13 Johns. 382), and Albany Dutch Church v. Vedder (14 Wend. 169), also differ for about the same reason. They merely hold that, in the absence of actual knowledge, mere negligence on the part of the creditor, however long continued, will not discharge the sureties.
The admission made in the present case, is that the plaintiff’s corporation had knowledge of the first default of fifteen dollars and ninety-two cents, and that with such knowledge the employment of William E. Barnes was continued' until his default amounted to two hundred and sixty-nine dollars and sixty-seven cents. The word “default” was used to raise a question of law and to obtain a ruling thereon. It, therefore, did not mean an innocent default, and as the court, in making the ruling, in effect held that the first default, no matter how grave or fraudulent, did not exonerate the sureties, it is too late to urge on appeal for the first time that the default meant might *53 have been an innocent one. The defendants are therefore not liable beyond the sum of fifteen dollars and ninety-two cents, except upon proof of their assent, with knowledge of tire facts, to the continuance of the employment after the first defalcation. Such assent, if given, would have revived and continued their liability. Por it is well established that a surety, after lie has been discharged from his contract by the act of the creditor, may revive his liability by a subsequent promise or assent (Mayhew v. Crickett, 2 Swan. 185; Smith v. Winter, 4 M. & W. 454).
No such proof having been given by the plaintiff, defendants’ exceptions should be sustained, the verdict should be set aside, and a new trial ordered, with costs to defendants to abide the event. But in case the plaintiff elect to consent to a reduction of the verdict to fifteen dollars and ninety-two cents and interest, plaintiff may have final judgment for that amount. In such case the defendants are entitled absolutely to the costs of the general term.